**EDGELEY EDUCATION ASSOCIATION,**
**Plaintiff-Appellant,**

**v.**

**EDGELEY PUBLIC SCHOOL DISTRICT**
**# 3, a Public Corporation,**
**Defendant-Appellee.**

**Civ. No. 9324.**

Supreme Court of North Dakota.

July 27, 1977.

Daniel J. Chapman, Bismarck, for plaintiff and appellant.

Theodore F. Kessel, of Kessel, Splitt & Kessel, LaMoure, for defendant and appellee.

PAULSON, Justice.

This is an appeal from the judgment of the district court of LaMoure County, dated November 3, 1976, denying injunctive relief sought by the Edgeley Education Association [hereinafter the EEA].

The instant case parallels the factual basis of our recent decision in *Dickinson Education Association v. Dickinson Public School District No. 1*, 252 N.W.2d 205 (N.D. 1977). The case at bar arose when the EEA sought to enjoin Edgeley Public School District No. 3, a public corporation [hereinafter the School District], from issuing or accept-

ing any teacher contracts with teachers of the school system represented by the EEA as the bargaining unit for its 1976–1977 school term. The EEA contends that such action would constitute an act of bad faith contrary to the provisions of Chapter 15–38.1 of the North Dakota Century Code.

As in *Dickinson, supra,* the parties in the instant case had conducted extended negotiations prior to reaching an impasse—meeting six times between February 5 and April 1, 1976. During such meetings, at least fifteen proposals by the EEA and twelve proposals by the School Board were discussed, but the conflicting proposals on increases in base salaries and increments became the central issue during the negotiating sessions. During the course of such negotiations, the EEA had reduced its proposals for a base salary increase from $2,184.00, together with an increase in increments in addition thereto, to $2,000.00, then to $1,800.00, then to $1,750.00, then to $1,700.00, then to $1,675.00, and finally to $1,650.00, on April 1, 1976. The School Board offered corresponding increases from its original base salary proposals, commencing with $100.00, then to $150.00, then to $200.00, then to $225.00, and finally to $250.00, on April 1, 1976.

On April 5, 1976, the School Board declared an impasse and submitted the matter to North Dakota's Education Factfinding Commission, pursuant to the provisions of § 15–38.1–13, N.D.C.C.

On the date the School Board declared an impasse, the difference between the School Board's and the EEA's proposed base salary increases was $1,400.00, which, if granted to the School District's 25 teachers, would have resulted in an additional $35,000.00 expense to the School District.

The Education Factfinding Commission held a hearing at which both parties were present on May 3, 1976, in Edgeley. On May 10, 1976, the Commission issued its written report making recommendations for settlement of the issues upon which the impasse existed. The Commission made eight recommendations for the resolution of the impasse, among which was included a recommendation that the base salary be increased by $300.00, raising the base salary to $8,100.00 for the 1976–1977 school year if the School Board would participate in a health and hospital insurance program and pay the cost of a single membership for each teacher desiring to participate in such insurance program; or that the base salary be increased by $550.00 to $8,350.00 for the 1976–1977 school year if the School Board chose not to establish such an insurance program.

The School Board considered the Factfinding Commission's report at a meeting held on May 11, 1976, and again at a meeting held on May 18, 1976. At the May 18 meeting the School Board rejected the Commission's recommendations.

On May 19, 1976, the EEA voted to accept the Factfinding Commission's recommendations.

On June 3, 1976, the Factfinding Commission's report was published in the Edgeley Mail, a newspaper published in the City of Edgeley.

Between April 1 and July 7, 1976, no contract negotiating sessions were held between the parties.

On or about June 15, 1976, the School Board caused individual teaching contracts to be sent to all teachers being negotiated with—some of which contracts were returned to the School Board prior to the issuance of a temporary restraining order by District Judge Robert L. Eckert, whose order was served upon representatives of the School Board on June 24, 1976.

On July 7, 1976, after the preliminary hearing held before District Judge Eckert, the temporary restraining order issued on June 23, 1976, was continued, enjoining the School Board from requiring the contracts issued to the teachers to be returned by June 24, 1976, and from giving effect to any contracts received by the School Board and from replacing any teachers or filling any teaching positions. As in *Dickinson, supra,* the district judge in the instant case further ordered the parties to conduct one more negotiating session to be held within seven

days, and further ordered that if no agreement were reached the temporary restraining order would be dissolved upon the passage of three additional days.

The negotiating session ordered by the district court was held on July 14, 1976, and immediately thereafter, the dispute not having been resolved, the EEA appealed to this Court, which granted a temporary restraining order dated July 16, 1976, from which order the School Board appealed. This Court heard the appeal on August 5, 1976, on which date this Court issued an injunctional order prohibiting the School Board from issuing or receiving teaching contracts pending the trial of the main action, and again urging the parties to resolve their differences by holding additional negotiations. Pursuant to such order, two additional meetings were held, one on August 11, 1976, and another on August 17, 1976, but no further progress was made.

The trial of the matter on the merits was held on September 9, 1976. The district court found as its Finding of Fact No. 13:

"That on the basis of these findings the Court determines that there was no failure to negotiate in good faith on the part of the Defendant [the School Board]."

Paragraphs 1, 2, 3, and 4 of the district court's Conclusions of Law state:

"1. That the issuance of contracts by the Defendant directly to the individual teachers instead of through the Plaintiff association and the intent to influence the Plaintiff to not use the orderly processes of the law as a means of protecting the rights of the Plaintiff were improper acts on the part of the Defendant, but are attributed in this case to the lack of expertise on the part of the Defendant in negotiating contracts with teachers and is not to be considered an act of bad faith for the purpose of this case.

"2. That the Court does not have the authority under the statutes of the State of North Dakota to impose its judgment on either the Plaintiff or the Defendant as to what are fair terms and conditions of employment. These are issues that can be resolved only by the voluntary agreement of the parties.

"3. That in view of the lengthy negotiations prior to the institution of the lawsuit, and which continued during the course of the litigation and even during the course of trial, it appears to the Court that no benefit would be achieved to either party by ordering a continuance of negotiations.

"4. That there is nothing in the statutes of the State of North Dakota that requires the parties to continue negotiating or provides for a means of resolving the dispute between the parties except by a voluntary agreement entered into by both parties."

The EEA contends that the district court erred in finding that the School Board acted in good faith in the course of contract negotiations with the EEA. Specifically, the EEA contends that five facts combined to demonstrate that the School Board was not negotiating in good faith:

1. That the School Board members had no knowledge of facts pertinent to the issues being discussed by the parties;

2. That the School Board froze its position on teachers' salaries as of April 1, 1976, refusing to move from that position in subsequent negotiations without providing any satisfactory explanation for its refusal to do so;

3. That the School Board declared an impasse at a time when the EEA had been steadily making progressively smaller counteroffers, following which the School Board received the report of the Education Factfinding Commission and rejected all of the Commission's recommendations;

4. That the School Board issued contracts to individual teachers without conducting any meetings with the EEA to discuss the Education Factfinding Commission's recommendations; and

5. That the School Board failed to conclude a good faith negotiation process at any time following its receipt of the Education Factfinding Commission's report.

■ In the instant case, we are asked to determine whether the School Board conducted teacher contract negotiations in good faith pursuant to the provisions of Chapter 15–38.1, N.D.C.C. Such is a question of fact and the findings of the district court will not be set aside unless clearly erroneous. Rule 52(a), N.D.R.Civ.P.; *Dickinson Education Association v. Dickinson Public School District No. 1, supra*, 252 N.W.2d at 209–210; *Edgeley Education Association v. Edgeley Public School District # 3*, 231 N.W.2d 826, 833 (N.D.1975). Bare formal compliance with the provisions of Chapter 15–38.1, N.D.C.C., is not at issue herein, as it is conceded that, subsequent to judicial intervention, both parties at least went through the motions leading to the conclusion of a good faith negotiation process.

This Court has previously considered what is meant by the requirements of § 15–38.1–12, N.D.C.C., to negotiate in good faith. In *Fargo Education Association v. Paulsen*, 239 N.W.2d 842, 847 (N.D.1976), we stated:

"The North Dakota Legislature also defined 'good faith' in § 1–01–21, NDCC, as follows:

'Good faith shall consist in an honest intention to abstain from taking any unconscientious advantage of another even through the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious.'

"With reference to 'good faith,' the Supreme Court of Michigan, in *Detroit Police Officers Ass'n v. City of Detroit*, 391 Mich. 44, 214 N.W.2d 803, 808 (1974), stated:

'The primary obligation placed upon the parties in a collective bargaining setting is to meet and confer in good faith. The exact meaning of the duty to bargain in good faith has not been rigidly defined in the case law. Rather, the courts look to the overall conduct of a party to determine if it has actively engaged in the bargaining process with an open mind and a sincere desire to reach an agreement. [Citations omitted.] The law does not mandate that the parties ultimately reach agreement, nor does it dictate the substance of the terms on which the parties must bargain. In essence the requirements of good faith bargaining is simply that the parties manifest such an attitude and conduct that will be conducive to reaching an agreement.'

"As used in the statute, we believe to 'negotiate' simply means to present proposals and offer counterproposals, to discuss proposals, to carry on a dialogue, to exchange ideas, all for the purpose of persuading or being persuaded by logic and reasoning. This means that the parties must also be willing to listen and not only talk. It is the art of friendly persuasion. The persuasion can result in an agreement and understanding or a settlement of issues. It does not mean that an agreement must be reached. Neither side is required by law to surrender or abrogate any of its duties and responsibilities. Neither does it mean formal or binding arbitration."

■ On appeal to this Court, the burden is on the EEA to affirmatively demonstrate that the School Board did not negotiate in good faith—this it has failed to do. Our perusal of the record, giving special attention to those facts the EEA contends evidence bad faith on the part of the School Board, reveals sufficient evidence to support the findings of the district court that the School Board negotiated in good faith and that the negotiation process, as of the time of the district court's judgment, had properly come to a conclusion.

In the instant case, the EEA has failed to move pursuant to Rule 52(b), N.D.R.Civ.P., to amend the district court's findings of fact so that such findings might specifically rule upon the particular factual issues raised herein on appeal. We therefore assume that the district court resolved each question of fact in a manner consistent with its judgment in favor of the School Board.

As this Court stated in *Dickinson, supra,* 252 N.W.2d 205, so long as there is some evidence to support the findings of the district court and we are not left with a definite and firm conviction that a mistake has been made, questions of fact decided by the district court upon conflicting evidence are not subject to reexamination by this Court, even if this Court might have viewed the facts differently if it had been the initial trier of the case.

█ The EEA's first contention, that the School Board members conducted their negotiations without knowledge of facts pertinent to the issues being discussed by the parties, is not persuasive. Although the EEA produced some evidence demonstrating that the School Board's negotiator lacked fiscal expertise on some monetary issues central to the negotiations being conducted, the School Board produced rebutting evidence demonstrating that School Board resource personnel did possess such knowledge; that such knowledge was conveyed to the School Board in the form of monthly fiscal reports; that such monthly fiscal reports clearly demonstrated that the School District was in a deteriorating financial position over the past three years; that a proposed increased mill levy had been recently defeated; and that the salary schedules proposed by the School Board were comparable to those of neighboring school districts. We find that the evidence before the district court supports its finding that the School Board members possessed sufficient knowledge of the facts pertinent to the issues being negotiated to enable such School Board members to participate in a good faith negotiation process.

█ The EEA's second contention, that the School Board froze its position on teachers' salaries as of April 1, 1976, refusing to alter its position in subsequent negotiations without providing a satisfactory explanation for its refusal to do so, is also unpersuasive. That the School Board tendered no new salary offers after April 1, 1976, is not disputed. However, the record discloses that a series of proposals to tender offers were made by the School Board's negotiator

at subsequent negotiation sessions and were rejected by the EEA—and, while we find this a very poor negotiation tactic, it does indicate that the School Board was willing to alter its previous bargaining position. It is also to be noted that subsequent to the EEA's acceptance of the Education Factfinding Commission's recommendations on June 19, the EEA also tendered no new salary offers. In addition to the foregoing, the Legislature has specifically stated, in subsection 4 of § 15–38.1–12, N.D.C.C., that:

"4. The obligations imposed in this section shall not compel either party to agree to a proposal or *to make a concession.*" [Emphasis added.]

Although the Legislature does not require either party to make a concession during negotiations, the factual basis for a party's refusal to make a particular concession is clearly a factor in determining whether or not that party is negotiating in good faith. In the instant case, the School Board's proposed base salary increase is very small in comparison with the rise in the cost of living—a $250.00 increase from a $7,800.00 base salary figure—and, if considered alone, might evidence bad faith. However, other factors are contained in the record, including the School District's current financial position, the unwillingness of the School District's voters to increase the School District's mill levy, the cost of other School District expenses (e. g., building, administrative and maintenance expenses, etc.), and the base salaries being offered by other school districts in the area. We find that the evidence before the district court supports its finding that the School Board's refusal to make salary concessions subsequent to April 1, 1976, did not constitute bad faith.

█ The EEA's third contention, that the School Board declared an impasse at a time when the EEA had been steadily making progressively smaller counteroffers, following which the School Board received the report of the Education Factfinding Commission and rejected all of the Commission's recommendations, also does not evidence bad faith on the part of the School Board.

The record clearly shows that at the time an impasse was declared the parties were nowhere near a settlement, a $1,400.00 gap existing between the parties' respective base salary proposals. No significant progress had been made during the previous three months, the EEA had indicated its intent to remain at its $1,650.00 base salary increase level, and the time for making firm commitments for the following school year was quickly approaching. We find that, given such facts, an impasse was properly declared. The School Board's refusal to accept the recommendations of the Education Factfinding Commission was adequately examined in our discussion of the EEA's second contention.

The EEA's fourth contention, that the School Board issued contracts to individual teachers without conducting any meetings with the EEA to discuss the Education Factfinding Commission's recommendations, also fails to evidence bad faith on the part of the School Board. Although the School Board held no additional negotiation sessions prior to its issuance of contracts, it did hold School Board meetings at which representatives of the EEA were present and at which it discussed and ultimately rejected the Education Factfinding Commission's recommendations. Further, such action was taken prior to our decision in *Dickinson, supra* 252 N.W.2d 205, and was based on the advice of an attorney who was extensively involved in school board activities on a statewide basis. As in *Dickinson, supra,* judicial intervention in the instant case corrected the School Board's misinterpretation of the Legislature's intent and ordered the parties to continue negotiations.

The EEA's final contention, that the School Board failed to conclude a good faith negotiation process at any time following its receipt of the Education Factfinding Commission's report and recommendations, presents the most difficult question raised herein, but, upon a careful consideration of the minutes of negotiation sessions conducted subsequent to judicial intervention, we affirm the decision of the district court.

The conclusion of a good faith negotiation process requires more than the mere passage of time and more than just going through the motions of a negotiation process—it implies that one or both sides have reached their final position, a position which is supported by pertinent factual considerations, including, but not limited to: the school district's income, actual and potential; the school district's expenses; the cost of living in the school district; the comparable salaries within the school district; school teachers' salaries in comparable school districts; and the economic climate of the community, the State, and the Nation (e. g., grain prices, voter willingness to approve mill levies, expanding or shrinking State and Federal aid programs, inflation-recession, etc.). In the instant case, from July 7 (the date of the first judicially ordered negotiation session) until the date of the trial in the district court, neither party has substantially varied its bargaining position. Although we find the above-enumerated factors to be more easily ascertained in the negotiation presentations made by the EEA, we find that such factors formed the bases for the fixed bargaining positions maintained by both the School Board and the EEA. Our review of the testimony and the exhibits presented to the district court indicates to us that the positions of the School Board and the EEA at the time of the trial of this matter were well founded upon factual considerations relevant to the issues being negotiated. At such point, the good faith negotiation process established in Chapter 15–38.1, N.D. C.C., ceases. The Legislature has failed to provide a mechanism by which the parties might resolve their remaining differences— thus, the School Board is permitted to issue contracts to the School District's teachers on the basis of its last offer.

The judgment of the district court is affirmed.

ERICKSTAD, C. J., and PEDERSON and SAND, JJ., concur.

VOGEL, Justice, dissenting.

I dissent, as I did in the earlier appeal involving the same parties, *Edgeley Education Assn. v. Edgeley Public School Dist. No. 3*, 231 N.W.2d 826 (N.D.1975), and in *Dickinson Education Assn. v. Dickinson Public School Dist. No. 1*, 252 N.W.2d 205 (N.D.1977).

In the present case, the majority recognizes that the facts are parallel to the facts in the *Dickinson* case, *supra*. My reasons for dissenting in the present case are set forth at length in the dissent in that case and in the dissent in the *Edgeley* case, and I will not repeat them here.

I must add, however, that I deplore the tendency of this court and some trial courts to condone clear violations of applicable law by school districts by finding such violations "harmless" or otherwise excusing them. In the case now before us, the trial court found that the issuance of individual contracts to teachers represented by an association was "improper," but "not to be considered an act of bad faith for the purpose of this case." The majority approves.

As I stated in my dissents referred to above, to me it is clear that such conduct by the School District constitutes bad-faith bargaining as a matter of law.